UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBE WHOLESALE TOBACCO DISTRIBUTORS INC.,

Plaintiff,

- against -

PLAINFIELD TOBACCO & CANDY COMPANY INC., ET AL,

Defendants.

25-cv-10799 (JGK)

**Memorandum Opinion and Order**

**John G. Koeltl, District Judge:**

The plaintiff, Globe Wholesale Tobacco Distributors Inc., brings this action against Plainfield Tobacco & Candy Company Inc. ("Plainfield"), Plainfield executives Jonathan Resnick and Steven Resnick (the "executives") (collectively, the "Plainfield defendants"), and J.P. Morgan Chase Bank, N.A. ("Chase"). Among other claims, the plaintiff alleges that Plainfield and its executives breached contracts relating to Plainfield's purchase of some of the plaintiff's assets.

The Plainfield defendants now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons explained below, the motion to dismiss is **granted in part** and **denied in part**.

## I.

Unless otherwise noted, the following facts are taken from the complaint, Not. of Removal, Ex. 1 ("Compl."), ECF No. 1-1, and are accepted as true for the purposes of this motion.[1]

The plaintiff, a wholesale tobacco distribution business, is a New York corporation with its principal place of business in New York. See Compl. ¶ 7; Plainfield's Rule 7.1 Statement at 2, ECF No. 3. Plainfield is a New Jersey corporation with its principal place of business in New Jersey. See Plainfield's Rule 7.1 Statement at 2. The executives, Jonathan Resnick and Steven Resnick, are citizens of New Jersey. See id. Chase is a national banking association with its main office in Ohio. See id.; Chase's Rule 7.1 Statement at 2, ECF No. 19. The plaintiff seeks millions of dollars in damages. See Compl. at 18.

### A.

On May 16, 2022, the plaintiff secured a $500,000 business loan from Chase, secured by the plaintiff's inventory. Compl. ¶ 8. Due to various industry conditions, the plaintiff later began negotiating with the Plainfield defendants

---

[1] The plaintiff also submitted a declaration by its principal in opposition to the motion to dismiss. See Pl.'s Mem., Ex. A, ECF No. 22-1. That is plainly improper, and the Court cannot rely on the declaration on this motion. See Friedl v. City of New York, 210 F.3d 79, 83–84 (2d Cir. 2000). In any event, the declaration is inconsistent with various allegations in the complaint. For example, the declaration asserts that the plaintiff remained in control of 90% of its business after the APA, which raises a question of how the Plainfield defendants then could have been responsible for the collection of accounts receivable.

to sell off numerous assets. Id. ¶¶ 8–9. Those negotiations culminated in the three agreements at issue in this case.

i.

First, the parties signed a letter of intent ("LOI") dated November 20, 2024.[2] Compl. ¶ 9; Defs.' Mot., Ex. B ("LOI") at 1, ECF No. 16-3. The plaintiff alleges that "[p]ursuant to the LOI and the parties' understanding," the plaintiff "transferred control of [its] entire business operations to the Plainfield Defendants, including customer lists, business relationships, inventory[,] and operational control[.]" Compl. ¶ 10. According to the plaintiff, this transfer allowed the Plainfield defendants "to effectively capture [the plaintiff's] customers." Id.

The LOI states that the plaintiff entered into the "agreement in good faith and in hope that the parties shall continue to negotiate mutually agreeable terms of an asset purchase transaction." LOI § (o). It also provides that "neither Plainfield nor [the plaintiff] is bound by this Agreement and no other provisions of this agreement shall obligate either party to enter into a purchase transaction with the other party." Id. The LOI further provides that Plainfield would "use commercially reasonable efforts to collect the existing pre-Effective date accounts receivable" of the plaintiff and would hold any collected receivables in a separate bank account. Id. § (h). Those funds would

[2] The complaint asserts that the LOI was dated November 18, 2024, see Compl. ¶ 9, but that is contradicted by the LOI itself, which appears to be dated November 20, 2024, and signed by the plaintiff on November 22, 2024. See Defs.' Mot., Ex. B ("LOI") at 1, ECF No. 16-3.

then be released to the plaintiff "on the earlier of the closing of any potential asset purchase transaction" between the parties "or termination of this Agreement." Id.

ii.

Second, the parties reached an alleged settlement agreement ("Settlement Agreement") on January 25, 2025, about their respective obligations under the LOI.[3] See Compl. ¶¶ 16–19; Defs.' Mot., Ex. C ("Settlement Agreement"), ECF No. 16-4. That agreement is reflected in an email exchange between the plaintiff's counsel and the defendant Steven Resnick with the subject line: "Understanding between Plainfield and Globe." Settlement Agreement at 1; see Compl. ¶¶ 18–19.

According to the complaint, the Settlement Agreement provided that the Plainfield defendants would buy the plaintiff's assets for $3,500,000, provide for an additional one-time payment of $500,000 by January 27, 2025, and require Plainfield to assume the Chase loan. See Compl. ¶ 20. The email reflecting the agreement states that "the total sale price is 3.5 Million Dollars," which is "the set number after lots of negotiation." Settlement Agreement at 1. It states that Plainfield "has agreed to make a further payment to [the

---

[3] The complaint asserts that the Settlement Agreement resolved disputes about the LOI and the APA. See Compl. ¶¶ 17–18. But the complaint also alleges, and the APA itself indicates, that the parties entered into the APA in March 2025, id. ¶ 11, after the Settlement Agreement, and the Settlement Agreement therefore could not have resolved a dispute about the APA. Indeed, the plaintiff's opposition submission asserts that the Settlement Agreement arose only from a dispute about the LOI. Pl.'s Mem. ¶ 4, ECF No. 22.

plaintiff] by wire of $500,000 on Monday, January 27, 2025 in the morning," and that "[t]his payment is imperative because [the plaintiff's principal] has been promising the city for weeks that he would pay this money." Id. It also states that "the parties will do their best to complete and close within two weeks, but no more than 30 days," and that they "have to work together on the closing" and "have to agree on the timing of the payments to the state simultaneously with closing the deal." Id. The email exchange, however, says nothing about the Chase loan.

The plaintiff further alleges that "[i]n a separate email, the Plainfield Defendants . . . confirmed the settlement terms," including that their payment would comprise: (1) $500,000 for goodwill; (2) $900,000 for inventory; (3) $1,200,000 for accounts payable paid (based on Plainfield's representation of the amount of receivables collected to that point); and (4) $762,000 for accounts receivable remaining (from certain customers with whom the plaintiff negotiated settlements). Compl. ¶¶ 21–22. Those payment terms total $3,362,000, which the plaintiff approximates to $3.5 million. Id. ¶ 21. Steven Resnick allegedly wrote that the Plainfield defendants "would like to have the documents signed tomorrow and arrange for direct payment to be made to the State and to Chase." Id. ¶ 23.

**iii.**

Third, the plaintiff and Plainfield entered into an Asset Purchase Agreement (the "APA") in March 2025. Compl. ¶ 11; Defs.' Mot., Ex. D ("APA"),

ECF No. 16-5. The APA identifies the plaintiff as the "Seller" and Plainfield as the "Buyer." APA at 1. The executives as individuals are not parties to the APA. See id. The APA contains a merger clause:

> This Agreement, together with the Disclosure Schedule (hereinafter defined), and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter hereof and thereof.

APA § 9.05. The APA also provides that, "[a]s consideration for the Purchased Assets," Plainfield must pay the plaintiff $500,000 for goodwill and an estimated $900,000 for inventory. APA §§ 1.04(a)(i)–(ii), 1.05. The purchase price is payable "[a]t the Closing," when Plainfield "shall deliver to [the plaintiff] by wire transfer of immediately available funds to the account(s) of [the plaintiff] designated in the closing statement . . . an amount equal to the Purchase Price[.]" Id. § 1.04(b)(i). The Closing "shall take place within five (5) business days of the execution of this Agreement[.]" Id. § 2.01. Plainfield's obligations under this agreement are subject to conditions precedent, including that the plaintiff has completed its own obligations and has delivered certain closing documents, such as proof that all liens on the purchased assets have been satisfied or a payoff letter from the lender. Id. §§ 2.02(a)(viii), 8.01–8.05.

The APA provides that Plainfield "shall not assume . . . any liabilities or obligations of [the plaintiff] of any kind[.]" Id. § 1.03. The plaintiff agreed to deliver the purchased assets "free of any debts, liabilities, and Encumbrances"

by paying them "in full or otherwise discharg[ing] [them] prior to or at the Closing." Id. § 5.09.

Under the APA, the plaintiff's accounts receivable are excluded from the purchased assets. Id. §§ 1.02(c), 1.04(c). Rather, the APA obligates Plainfield to "use commercially reasonable efforts to collect [the plaintiff's] collectible A/R," to deposit any receivables it collects in a separate account, and to release those collected funds to the plaintiff weekly. Id. § 1.04(c). Steven Resnick allegedly "confirmed . . . in writing" that Plainfield "will collect the [accounts receivable] monies on [the plaintiff's behalf] and transfer them accordingly." See Compl. ¶ 13. The parties further acknowledged that Plainfield "took over the operations of [the plaintiff] in or about November 20, 2024 and in that role collected the [plaintiff's] A/R." APA § 1.04(c). The plaintiff also acknowledged that Plainfield "owes no additional amounts" to the plaintiff for any accounts receivable Plainfield "previously collected." Id.

The plaintiff does not allege that the transaction under the APA closed. Rather, it alleges that the Plainfield defendants failed to close the transaction within the agreed timeframe and acted in bad faith to prevent the closing. Compl. ¶¶ 44, 49.

## B.

The plaintiff alleges that the Plainfield defendants have paid only part of what was agreed, and only to the New York State Department of Taxation and Finance (the "State") to satisfy the plaintiff's cigarette tax stamp liability.

See Compl. ¶¶ 25–26. The plaintiff identifies six alleged payments: (1) $171,066.33 on December 27, 2024; (2) $537,891.20 on January 3, 2025; (3) $500,000 on February 27, 2025; and (4) three payments in the amounts of $306,741.13, $900,000, and $73,715.58 on April 11, 2025. Id. ¶ 24. The six payments combined total $2,489,414.24, which is $1,010,585.76 less than the alleged $3,500,000 purchase price in the Settlement Agreement. Id. ¶¶ 24, 26. The plaintiff alleges that the Plainfield defendants paid nothing to the plaintiff or to Chase. See id. ¶¶ 25, 27.

The plaintiff further alleges that "[t]he Plainfield defendants have continued to service [the plaintiff's] customers and collect receivables on those accounts but have refused to remit any additional funds to the plaintiff." Compl. ¶ 28. According to the complaint, the Plainfield defendants acted in bad faith to deprive the plaintiff of the agreed-upon consideration, including by converting the plaintiff's credit customers to cash-on-delivery ("COD") customers to bypass the plaintiff's receivables. Id. ¶¶ 29–30, 33. The plaintiff also alleges that the Plainfield defendants "have provided pretextual excuses for non-payment, claiming deficiencies in [the plaintiff's] documentation even though [the plaintiff] has successfully collected debts in multiple court proceedings using the same documentation." Id. ¶ 31.

The plaintiff also alleges that the Plainfield defendants increased their bond because of the asset acquisition, which, according to the plaintiff, shows that the Plainfield defendants "sought and obtained the benefits of the transaction while refusing to fulfill their obligations." Compl. ¶ 34. As a result

of this alleged bad-faith refusal, the plaintiff allegedly continued to accrue interest and penalties from the State and other creditors and has been unable to complete a secondary transaction to sell its stock. Id. ¶¶ 35–36.

Finally, the plaintiff alleges that the Plainfield defendants fraudulently conspired to induce the plaintiff to enter into the LOI, the Settlement Agreement, and the APA "with no intention of fulfilling their obligations." Compl. ¶ 37. According to the complaint, "[t]he Plainfield Defendants made material misrepresentations regarding their . . . [i]ntent to collect and remit [the plaintiff's] receivables," their "[a]bility and willingness to pay the full purchase price," their "[i]ntent to assume [the plaintiff's] Chase loan," and their "[i]ntent to honor the $3.5 million settlement agreement." Id. ¶ 38. The plaintiff alleges that it relied on these representations when it "transferr[ed] its entire business, customer base, and operational control to the Plainfield Defendants" for "grossly inadequate" payment. Id. ¶ 39–40.

## C.

The plaintiff filed this action in the Supreme Court of the State of New York, New York County, on December 1, 2025. See Compl. at 1. The complaint asserts thirteen claims under New York law: (1) breach of the Settlement Agreement; (2) breach of the LOI and APA; (3) conversion; (4) fraudulent inducement; (5) unjust enrichment; (6) replevin; (7) accounting; (8) specific performance; (9) tortious interference with prospective business relations; (10) usurpation of corporate opportunities; (11) conspiracy; (12) self-dealing and

misappropriation of corporate assets, in violation of New York Business Corporation Law § 720(a)(1)(B); and (13) injunctive relief. Compl. at 10–17.

The plaintiff seeks compensatory damages totaling $5,530,585.76 for: (1) unpaid receivables in the amount of $3,710,585.76 ($6,200,000 minus $2,489,414.24); (2) unpaid goodwill in the amount of $500,000; (3) unpaid inventory in the amount of $900,000; and (4) the balance of the plaintiff's Chase loan in the amount of $420,000. Id. at 18. The plaintiff also seeks damages for: "lost business opportunities, including the failed secondary stock transaction"; treble and punitive damages; preliminary and permanent injunctive relief; "[a]n accounting of all funds collected and retained" by the Plainfield defendants; specific performance of the Settlement Agreement, LOI, and APA; pre-judgment and post-judgment interest; and attorneys' fees. Id.

On December 31, 2025, the defendants, invoking diversity jurisdiction, removed this action to this Court. See Not. of Removal ¶ 10, ECF No. 1. The plaintiff moved to remand this action to state court on January 6, 2026. ECF No. 5. While that motion was pending, the Court gave the plaintiff an opportunity to file an amended complaint (ECF No. 12), but the plaintiff did not do so. The Court denied the plaintiff's motion to remand on April 8, 2026. ECF No. 14. On April 20, 2026, the Plainfield defendants filed the present motion to dismiss the complaint pursuant to Rule 12(b)(6).[4] ECF No. 16.

[4] Chase answered the complaint on April 24, 2026, and asserted counterclaims and crossclaims that are not at issue on this motion. ECF No. 17.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."[5] Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.[6]

---

[5] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

[6] The plaintiff's opposition submission correctly cites Twombly and Iqbal but then relies on the standard of Conley v. Gibson, 355 U.S. 41, 45–46 (1957), under which a complaint should not be dismissed unless the defendant shows that there is "no set of facts" that could establish the plaintiff's claims. See Pl.'s Mem. at 1, 4–5, ECF No. 22. But the Supreme Court retired that standard in Twombly. See 550 U.S. at 562–63. The plaintiff must instead plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

"For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). "When allegations contained within the complaint are contradicted by documents attached to the complaint, the documents control, and the Court need not accept the allegations contained within the complaint as true." Rozsa v. May Davis Grp., Inc., 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002), aff'd sub nom. Rozsa v. SG Cowen Sec. Corp., 165 F. App'x 892 (2d Cir. 2006).

## III.

The Plainfield defendants move to dismiss all thirteen of the plaintiff's claims. The complaint asserts two claims for breach of contract: one for breach of the alleged Settlement Agreement, and one for breach of the LOI and APA. The remaining claims either duplicate the breach of contract claims or—as to specific performance and an injunction—are remedies rather than causes of action. Moreover, many of the plaintiff's claims rest on wholly conclusory allegations that do not state a claim. See Iqbal, 556 U.S. at 678.

In this case, "[t]he parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

### A.

As an initial matter, the complaint fails to state a claim against the executives, Jonathan Resnick and Steven Resnick. The complaint refers throughout to the "Plainfield Defendants" without distinguishing among Plainfield and the executives. "[C]omplaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." Leneau v. Ponte, No. 16-cv-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018). The plaintiff alleges no specific conduct with respect to Jonathan Resnick. The only conduct the plaintiff attributes to Steven Resnick is that he sent emails confirming the Settlement Agreement, including the "obligation to pay Chase's loan," and that, at some unspecified time and in some unspecified format, he "confirmed . . . in writing" that Plainfield "will collect the [accounts receivable] monies on [the plaintiff's behalf] and transfer them accordingly." See Compl. ¶¶ 13, 19, 23.

Those allegations relate to Steven Resnick's conduct on behalf of Plainfield. "Under New York law, an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." Lerner v. Amalgamated Clothing & Textile Workers Union, 938 F.2d 2, 5 (2d Cir. 1991). The complaint alleges no such evidence. Moreover, the APA provided a contractual relationship between the plaintiff and Plainfield, not its individual executives. See APA at 1. A non-signatory generally cannot be held

liable for breach of a contract, and in this case the plaintiff has not alleged that either executive "manifested an intent to be bound by the contract" See MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009). Accordingly, all claims against the Plainfield executives are **dismissed.**

**B.**

To state a claim for breach of contract under New York law, a plaintiff must allege: "(1) the existence of an agreement"; "(2) adequate performance of the contract by the plaintiff"; "(3) breach of contract by the defendant"; "and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). "New York courts require plaintiffs to plead the provisions of the contract upon which the claim is based—in other words, a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated." Anders v. Verizon Commc'ns Inc., No. 16-cv-5654, 2018 WL 2727883, at *8 (S.D.N.Y. June 5, 2018).

The plaintiff's contract claims rest on several theories of breach. The plaintiff alleges that the Plainfield defendants failed to pay the agreed price, failed to close within the agreed time, failed to assume the plaintiff's Chase loan, failed to collect and remit the plaintiff's accounts receivable, failed to pay for goodwill, and acted in bad faith to prevent closing. See Compl. ¶¶ 24–30, 33, 44, 49. Only the accounts receivable theory states a claim, and only for breach of the APA, under which Plainfield is obligated to "use commercially reasonable efforts" to collect the plaintiff's receivables and to release the

collected funds to the plaintiff weekly. APA § 1.04(c). Accordingly, the claim against Plainfield for breach of the APA survives only to the extent that it is based on the alleged failure to collect and remit the plaintiff's accounts receivable, and the contract claims are otherwise **dismissed**.

**i.**

The Plainfield defendants move to dismiss the first claim, for breach of the Settlement Agreement. According to the complaint, the Settlement Agreement set the price for the plaintiff's assets at $3,500,000 and obligated the Plainfield defendants to make an additional one-time payment of $500,000 by January 27, 2025, and to assume the plaintiff's Chase loan. See Compl. ¶ 20. But the complaint does not plausibly allege that the Plainfield defendants breached any of those terms.

First, the complaint does not specifically allege that the Plainfield defendants failed to make the one-time payment of $500,000. Compl. ¶ 44. According to the Settlement Agreement, Plainfield "has agreed to make a further payment to [the plaintiff] by wire of $500,000," which "is imperative" because the plaintiff's principal "has been promising the city for weeks that he would pay this money." Settlement Agreement at 1. Under count one of the complaint, however, there is no specific allegation that the $500,000 payment was unpaid. See Compl. ¶ 44. The complaint does not otherwise specify that the amount owed included the $500,000 payment. See id. ¶¶ 24–26, 44. Instead, the plaintiff alleges that the Plainfield defendants made a $500,000

payment to the State on February 27, 2025. Id. The complaint does not specifically allege that February 27 payment failed to satisfy Plainfield's obligation under the Settlement Agreement.

Second, the complaint does not plausibly allege that the Plainfield defendants breached the agreement by paying the State rather than the plaintiff. In a separate email, the Plainfield defendants allegedly confirmed that their payment would comprise $500,000 for goodwill, $900,000 for inventory, $1,200,000 for accounts payable paid, and $762,000 for accounts receivable remaining. Id. ¶¶ 21–22. The Plainfield defendants later paid $500,000 and $900,000 to the State to satisfy the plaintiff's cigarette tax stamp liability. Id. ¶¶ 24–26. But the complaint does not allege that either the Settlement Agreement or the separate email specified to whom the payments by the Plainfield defendants would be made. To the contrary, Steven Resnick allegedly wrote that the Plainfield defendants would "arrange for direct payment to be made to the State[.]" Id. ¶ 23.

Third, the complaint does not plausibly allege that the Settlement Agreement obligated the Plainfield defendants to assume the Chase loan. The email exchange that reflects the Settlement Agreement says nothing about the Chase loan. See Settlement Agreement at 1–2. The alleged separate email confirming the settlement terms only lists a payment breakdown without mentioning the loan. See Compl. ¶¶ 21–22. The complaint characterizes Steven Resnick as confirming an "obligation to pay Chase's loan," but the only relevant statement the complaint identifies is Steven Resnick's "writing" that the

Plainfield defendants "would like to have the documents signed tomorrow and arrange for direct payment to be made to the State and to Chase." Id. ¶ 23. That statement does not say how much Chase would be paid, for what, or whether the payment would be in addition to the agreed price—let alone whether the Plainfield defendants would assume the plaintiff's loan. Absent specific allegations, the plaintiff's characterization of Steven Resnick's statement as confirming a loan obligation is a legal conclusion that the Court need not accept. See Iqbal, 556 U.S. at 678.

Because the complaint fails to allege a breach of the Settlement Agreement, it is unnecessary to reach the Plainfield defendants' argument that the APA superseded that agreement. The motion to dismiss the claim for breach of the Settlement Agreement is **granted**.

**ii.**

The Plainfield defendants also move to dismiss the second claim, for breach of the LOI and the APA. That claim alleges that the Plainfield defendants breached those agreements by "[c]ollecting but not remitting receivables to [the plaintiff]"; "[c]onverting [the plaintiff's] customers to COD, thereby diverting [the plaintiff's] receivables"; "[f]ailing to pay for goodwill"; "[f]ailing to assume the Chase loan"; and "[a]cting in bad faith to prevent closing." Compl. ¶ 49. Only the first two theories, which concern the accounts receivable, state a claim, and only for breach of the APA.

The APA superseded the LOI as to the accounts receivable. "[U]nder New York law, a subsequent contract regarding the same subject matter supersedes the prior contract." Kreiss v. McCown DeLeeuw & Co., 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999). The APA and LOI concern the same proposed sale, as well as the collection and remittance of the plaintiff's accounts receivable. See LOI §§ (o), (h); APA at 1; id. § 1.04(c). The accounts receivable provisions in the two agreements are inconsistent. The LOI required Plainfield to maintain collected receivables in a separate account until the transaction closed or the LOI terminated. LOI § (h). The APA, by contrast, requires Plainfield to release collected receivables "on a weekly basis." APA § 1.04(c). To the extent the plaintiff seeks to recover receivables collected after entering the LOI, the plaintiff disclaimed any entitlement to those funds as soon as it entered the APA. See id. (acknowledging that Plainfield "owes no additional amounts" for receivables "previously collected"). The plaintiff's remedy for any failure to collect and remit its accounts receivable therefore lies under the APA. See Northville Indus. Corp. v. Fort Neck Oil Terminals Corp., 474 N.Y.S.2d 122, 125 (App. Div. 1984), aff'd, 477 N.E.2d 1102 (N.Y. 1985).

The plaintiff states a claim for breach of § 1.04(c) of the APA. That provision requires Plainfield to "use commercially reasonable efforts to collect [the plaintiff's] collectible A/R" and to maintain the collected funds in a separate account before releasing them to the plaintiff "on a weekly basis." APA § 1.04(c). The plaintiff alleges that the Plainfield defendants breached that obligation in two ways. First, the plaintiff alleges that the Plainfield

defendants "have continued to service [the plaintiff's] customers and collect receivables on those accounts but have refused to remit any additional funds to [the plaintiff]." Compl. ¶ 28. That is a straightforward allegation that Plainfield failed to pay over receivables that it collected. Second, the plaintiff alleges that Plainfield "intentionally failed to collect [the plaintiff's] receivables in the regular course of business, instead converting [the plaintiff's] credit customers to . . . [COD] customers, thereby bypassing [the plaintiff's] receivables and depriving [the plaintiff] of the funds owed." Id. ¶ 30; see id. ¶¶ 29, 33. That allegation supports a plausible inference that Plainfield did not use commercially reasonable efforts to collect the receivables.

The Plainfield defendants' argument that the complaint does not allege a closing, see Defs.' Mem. at 12, ECF No. 16-6, does not defeat this claim. Section 1.04(c) is not conditioned on the closing. It describes collections that Plainfield had been performing after it "took over the operations of [the plaintiff] in or about November 20, 2024," and it requires weekly payments of those collected funds. APA § 1.04(c).

The viability of this claim, however, is limited to Plainfield's obligations under § 1.04(c). The plaintiff alleges that Plainfield was also obligated to collect and remit "all accounts receivable," totaling $6,200,000. Compl. ¶ 15. But the APA provides that Plainfield "is not acquiring any of the [plaintiff's] A/R," and it obligates Plainfield only to "use commercially reasonable efforts to collect" the receivables and to pay the plaintiff what it collects. APA § 1.04(c); see id. § 1.02(c). Nothing in the APA obligates Plainfield to collect all of the accounts

receivable or to pay the plaintiff the total value, and to the extent that the complaint alleges otherwise, the APA controls. See Matusovsky, 186 F. Supp. 2d at 400.

The plaintiff's remaining theories of breach fail. Contrary to the plaintiff's assertion, neither the LOI nor the APA appear to obligate Plainfield "to assume the Chase loan." Compl. ¶¶ 44, 49. To the contrary, the LOI provides nothing about the Chase loan, and the APA excludes all the plaintiff's liabilities except for "specified liabilities" that are left undefined by the agreement and by the plaintiff.[7] Pl.'s Mem. at 17, ECF No. 22; see APA § 1.03. Nor is Steven Resnick's alleged writing about his interest in "arrang[ing] for direct payment . . . to Chase," without more, a plausible allegation that Plainfield agreed to assume the Chase loan. Compl. ¶ 23.

The plaintiff also contends that Plainfield breached the APA by "[f]ailing to pay for goodwill." Compl. ¶ 49. But the APA makes the goodwill payment, like the rest of the purchase payment, payable "[a]t the Closing." APA § 1.04(b)(i). The complaint does not allege that the transaction closed.

The plaintiff instead asserts that Plainfield prevented the closing through its "bad faith" conduct. Compl. ¶ 49. The LOI, however, imposed no obligation on either party to close. Rather, the LOI states that neither party "is bound by this Agreement" and that no provision of it "shall obligate either

[7] The APA refers in passing to "Assumed Liabilities," see APA §§ 1.06(b), 5.09, but does not define that term, and the plaintiff does not contend that any provision of the APA makes the Chase loan an assumed liability.

party to enter into a purchase transaction with the other party." LOI § (o). The APA provides that closing "shall take place within five (5) business days" of the APA's execution. APA § 2.01. But Plainfield's obligation to close in that timeframe is subject to conditions precedent, including that the plaintiff has performed its own obligations and has delivered specific closing documents, including proof that the liens on the purchased assets have been satisfied or a payoff letter from the lender. Id. §§ 2.02(a), 8.01–8.02. Granted, the plaintiff need only allege generally that conditions precedent have occurred or been performed. Fed. R. Civ. P. 9(c). But the plaintiff only does so as to the Settlement Agreement, alleging that the plaintiff "performed all conditions precedent" to that agreement. Compl. ¶ 43 (emphasis added). The plaintiff makes no similar allegation as to the APA.

The plaintiff argues that Plainfield cannot "rely on the nonoccurrence of a condition precedent" that Plainfield itself prevented. Pl.'s Mem. at 18. It is true that "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of City of N.Y., 268 N.E.2d 782, 784 (N.Y. 1971). But the plaintiff does not plausibly allege that Plainfield prevented the occurrence of any condition precedent. The only related conduct alleged in the complaint is that the Plainfield defendants "provided pretextual excuses for non-payment, claiming deficiencies in [the plaintiff's] documentation even though [the plaintiff] has successfully collected debts in multiple court proceedings using the same documentation." Compl.

¶ 31. That allegation does not specify the documentation at issue or the condition, if any, to which it related. See APA § 2.02(a). That the plaintiff has used the same documentation to collect debts in other actions says nothing about whether the plaintiff satisfied the APA's conditions to closing in this action. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (explaining that a court may "take judicial notice of documents filed in other courts," but "not for the truth of the matter asserted"); see also Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006). The allegation that the Plainfield defendants acted in bad faith to prevent closing is therefore wholly conclusory. See Iqbal, 556 U.S. at 678. Nor can the plaintiff's alleged "substantial performance" excuse those conditions. See Pl.'s Mem. at 18. Under New York law, an "express condition must be literally performed." See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415, 418 (N.Y. 1995).

Accordingly, the motion to dismiss the claim for breach of the LOI is **granted**. The motion to dismiss is **denied** with respect to the claim for breach of the APA, to the extent that such a claim is based on Plainfield's alleged failure to collect and remit the plaintiff's accounts receivable. The motion to dismiss the claim for breach of the APA is otherwise **granted**.

## C.

The plaintiff's remaining claims—conversion, fraudulent inducement, unjust enrichment, replevin, accounting, specific performance, tortious

interference with prospective business relations, usurpation of corporate opportunities, conspiracy, violation of New York Business Corporation Law § 720(a)(1)(B), and injunctive relief—all fail to state a claim and are therefore **dismissed**.

**i.**

In New York, "conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403–04 (2d Cir. 2006). "[A] claim for conversion cannot be predicated on a mere breach of contract." MBL Life Assurance Corp. v. 555 Realty Co., 658 N.Y.S.2d 122, 124 (App. Div. 1997).

The plaintiff's conversion claim relates to the plaintiff's accounts receivable. See Compl. ¶¶ 52–54. If Plainfield complied with the APA, there was no conversion; if it did not, the plaintiff's remedy is its claim for breach of the APA. The conversion claim is therefore duplicative of the claim for breach of the APA and is **dismissed**. See MBL Life Assurance Corp., 658 N.Y.S.2d at 124; Rise Dev. Partners, LLC v. Signature Bank, No. 23-cv-4242, 2024 WL 4555758, at *4 (S.D.N.Y. Oct. 22, 2024) (dismissing conversion claim as duplicative of breach of contract claim).

**ii.**

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which

the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam). Federal Rule of Civil Procedure 9(b) further provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." To satisfy this requirement, a plaintiff "should specify the time, place, speaker, and content of the alleged misrepresentations." Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001). The plaintiff must also "allege facts that give rise to a strong inference of fraudulent intent." See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d. Cir. 2006).

The plaintiff alleges that the Plainfield defendants entered into the agreements with no intention of performing their obligations. See Compl. ¶ 37. But merely "dressing up a breach of contract claim" by alleging that a defendant "never intended to perform the precise promises spelled out in the contract" is not a claim for fraud. Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001). That is precisely the problem in this case. The plaintiff alleges that the Plainfield defendants misrepresented their intention to perform their obligations—namely, to collect and remit receivables, pay the purchase price, assume the Chase loan, and honor the Settlement Agreement. See Compl. ¶ 38.

The plaintiff also generally alleges that the Plainfield defendants misrepresented their present ability to pay the agreed-upon price. See Compl.

38, 56. That alleged misrepresentation is not collateral to the parties' agreement, however, because the executed APA represents that Plainfield has sufficient funds to pay "all amounts payable" to the plaintiff "when due." APA § 4.05; see Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996). But the complaint does not identify who made those alleged misrepresentations, or when, where, or in what words they made it. Nor does the plaintiff allege any facts, beyond the alleged nonperformance itself, to provide a strong inference that the Plainfield defendants knew whatever statements they made were false when they made them. See Lerner, 459 F.3d at 290–91. The plaintiff's allegation of misrepresentation therefore fails to satisfy Rule 9(b). See Caputo, 267 F.3d at 191. Accordingly, the plaintiff's fraudulent inducement claim is **dismissed**.

**iii.**

To state a claim for unjust enrichment under New York law, a plaintiff must allege: "(1) the other party was enriched"; "(2) at that party's expense"; and "(3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co. v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012). But "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).

There is no allegation that the APA is not a valid contract, and the plaintiff sues for alleged violations of that contract. The APA therefore bars the unjust enrichment claim. See Rise Dev., 2024 WL 4555758, at *5 (dismissing unjust enrichment claim as duplicative of breach of contract claim). The unjust enrichment claim is **dismissed**.

**iv.**

"Replevin is a remedy employed to recover specific, identifiable items of personal property." TAP Manutenção e Engenharia Brasil S.A. v. Int'l Aerospace Grp., Corp., 127 F. Supp. 3d 202, 211 (S.D.N.Y. 2015). When a defendant came to possess the property lawfully, the plaintiff must show that it demanded the property back and was refused. See Christie's Inc. v. Davis, 247 F. Supp. 2d 414, 419 (S.D.N.Y. 2002). And like a claim for conversion, a claim for replevin "should proceed under a contract theory when the plaintiff is essentially seeking enforcement of a contractual duty." Aleem v. Experience Hendrix, L.L.C., No. 16-cv-9206, 2017 WL 3105870, at *5 (S.D.N.Y. July 20, 2017).

The property that the plaintiff seeks to recover is its client lists. See Compl. ¶¶ 66–70. The plaintiff alleges that it transferred control of its client lists to Plainfield "[p]ursuant to the LOI and the parties' understanding," id. ¶ 10, and the APA confirms that Plainfield "took over operations of [the plaintiff] in or about November 20, 2024," APA § 1.04(c). There is otherwise no

allegation that the defendants came into possession of the client lists unlawfully.

The plaintiff alleges that "upon not being paid" it "has demanded the return of [the client lists] and the Plainfield Defendants have failed to return same." Compl. ¶ 68. But that demand rests on the alleged partial nonpayment, and the parties' agreements govern whether Plainfield has a duty to pay anything more for the client lists or to return them. The replevin claim therefore seeks to enforce a contractual duty and is duplicative of the plaintiff's contract claim. See Aleem, 2017 WL 3105870, at *5. The replevin claim is **dismissed**.

**V.**

"Under New York law, there are four elements to a claim for equitable accounting: (1) a fiduciary relationship"; "(2) entrustment of money or property"; "(3) no other remedy"; "and (4) a demand and refusal of an accounting." Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc., 333 F Supp. 3d 307, 315 (S.D.N.Y. 2018).

There are no allegations of a fiduciary relationship between the plaintiff and the Plainfield defendants, whose relationship with the plaintiff arises from the parties' agreements. And the plaintiff has another remedy—namely, its claim for breach of the APA. The accounting claim is therefore **dismissed**.

**vi.**

Under New York law, "specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action." Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co., 52 F. Supp. 3d 601, 619 n.7 (S.D.N.Y. 2014); see also Nortek Inc. v. ITT LLC, No. 21-cv-3999, 2025 WL 588226, at *7 (S.D.N.Y. Feb. 24, 2025) ("[S]pecific performance is a remedy, and a remedy itself cannot be a cause of action.").[8]

The plaintiff concedes that specific performance is an equitable remedy, not a "free-standing" cause of action. Pl.'s Mem. at 29. The claim for specific performance is therefore **dismissed with prejudice**. That disposition dismisses specific performance only as an independent cause of action; it does not strike specific performance from the relief that the plaintiff seeks.

**vii.**

To state a claim for tortious interference with prospective business relations, a plaintiff must allege that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally

---

[8] In limited circumstances not relevant here, courts in this Circuit and in New York have sometimes recognized a standalone claim for specific performance. See, e.g., Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC, 737 F. Supp. 3d 195, 207 n.4 (S.D.N.Y. 2024); Terex Corp. v. Bucyrus Int'l, Inc., 943 N.Y.S.2d 18, 21 (App. Div. 2012). In cases such as this, however, "where plaintiffs allege a breach of contract claim and also a separate cause of action for specific performance, courts often dismiss the separate specific performance claim as duplicative of the breach of contract claim, but without prejudice to the plaintiff's ability to seek specific performance as a remedy." Wells Fargo Bank, N.A. v. Barrington Park Owner LLC, No. 23-cv-9972, 2024 WL 4188668, at *2 (S.D.N.Y. Sep. 13, 2024).

interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006). The plaintiff must allege that the defendant "direct[ed] some activities toward the third party and convince[d] the third party not to enter into a business relationship with the plaintiff." See Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997).

The plaintiff does not allege any specific third-party relationship with which the Plainfield defendants interfered. The APA reflects that the plaintiff had a potential agreement to sell its stock to a third party after the asset sale was completed, APA § 5.07(c), and the plaintiff alleges it has been unable to complete that transaction, Compl. ¶ 36. But the plaintiff does not allege that the Plainfield defendants directed any conduct toward that third party. The alleged injury to the third-party transaction is collateral to the alleged failure to close, which is a matter of contract. Moreover, the claim rests on the same conduct as the claim for breach of the APA, and the complaint does not identify any legal duty independent of that contract that the Plainfield defendants violated. See Clark-Fitzpatrick, 516 N.E.2d at 193 ("[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."). The tortious interference claim is **dismissed**.

### viii.

The corporate opportunity doctrine is based on a duty of loyalty to an employer and "provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." Alexander & Alexander of N.Y., Inc. v. Fritzen, 542 N.Y.S.2d 530, 533–34 (App. Div. 1989).

The plaintiff does not allege that the Plainfield defendants were fiduciaries or employees of the plaintiff. The only alleged relationship between the Plainfield defendants and the plaintiff arises from the parties' agreements. Moreover, the plaintiff's usurpation claim rests on the same alleged conduct as the claim for breach of the APA, without identifying any legal duty independent of that contract. Accordingly, the claim for usurpation of corporate opportunities is **dismissed**.

### ix.

There is no independent claim for civil conspiracy under New York law. See Kirch, 449 F.3d at 401. Rather, an allegation of conspiracy may be used "only to connect the actions of separate defendants with an otherwise actionable tort." See Alexander & Alexander of N.Y., 503 N.E.2d at 102–03. A plaintiff alleging civil conspiracy must therefore plead "the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage

or injury." World Wrestling Fed'n Ent., Inc. v. Bozell, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001).

The plaintiff has failed to state a claim for any underlying tort. Because the conspiracy claim cannot stand on its own, it is **dismissed with prejudice** as an independent cause of action.

**X.**

Section 720 of the New York Business Corporation Law permits an action against "one or more directors or officers of a corporation" to compel an accounting for their official conduct in specified cases, including "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties." N.Y. Bus. Corp. Law § 720(a)(1)(B).

The plaintiff brings its claim under that provision against Plainfield's "officers and/or directors." Compl. ¶ 92. The Plainfield defendants argue that the plaintiff cannot bring this claim because it does not allege that Plainfield's executives are officers or directors of the plaintiff. See Defs.' Mem. at 25.

The Plainfield defendants are correct. Section 720 addresses the duties that directors and officers owe to their own corporation, and an action under it may be brought only "by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof," or, in a derivative action, by a shareholder of the corporation. N.Y. Bus. Corp. Law § 720(b). Jonathan Resnick and Steven Resnick are alleged to be executives of Plainfield, not of

the plaintiff, and the plaintiff does not otherwise allege that it is a receiver, trustee in bankruptcy, officer, director, judgment creditor, or shareholder of Plainfield. The plaintiff responds only that § 720 "is not as narrow as defendants suggest and may reach pleaded misconduct given the nature of the claims and the defendants' roles," Pl.'s Mem. at 32, but it cites no authority permitting an action under § 720 by a party not listed under § 720(b). Moreover, the complaint provides no particulars as to how the executives engaged in self-dealing or misappropriated the plaintiff's assets. The claim under § 720 is therefore **dismissed**.

**xi.**

"[A]n injunction is a remedy, not a separate cause of action." Catalano v. BMW of N. Am., LLC, 167 F. Supp. 3d 540, 563 (S.D.N.Y. 2016). The plaintiff's claim for an injunction is therefore not a cause of action but a form of relief. The claim for injunctive relief is **dismissed with prejudice**. As with specific performance, that disposition does not strike the request for injunctive relief from the relief sought in the complaint.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the Plainfield defendants' motion to dismiss is **granted in part** and **denied in part**. The motion is **denied** with respect to the claim against Plainfield for breach of the APA, to the extent that such a claim is

based on Plainfield's alleged failure to collect and remit the plaintiff's accounts receivable. The motion is otherwise **granted**. The claims for violation of New York Business Corporation Law § 720(a)(1)(B), specific performance, conspiracy, and injunctive relief are **dismissed with prejudice**. All other claims, including all other claims against Jonathan Resnick and Steven Resnick, are **dismissed without prejudice**.

The Clerk is respectfully requested to close ECF No. 16.

**SO ORDERED.**

**Dated:** **New York, New York**
**November 24, 2026**

**John G. Koeltl**
**United States District Judge**